**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**PARKERSBURG DIVISION**

UNITED STATES OF AMERICA,

               Plaintiff,

v.                                   CRIMINAL ACTION NO. 6:10-cr-00067

WILLIAM CLEARANCE BARBER II,

               Defendant.

**MEMORANDUM OPINION AND ORDER**

Before the Court are William Clearance Barber II's Motion to Dismiss Indictment [Docket 32] and Motion to Suppress [Docket 33].  On September 1, 2010, the Court held a hearing and heard argument regarding the pending motions.  At the conclusion of the hearing, the Court ordered the parties to submit briefing on the motions, and that briefing has been received.  For the reasons set forth below, both motions are **DENIED**.

*I.  BACKGROUND*

On April 20, 2010, the grand jury returned a single-count indictment against Defendant William Clearance Barber II, charging him with possession with intent to distribute 50 grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1).  In his pending motion to dismiss, Defendant contends that his plea agreement with a West Virginia state prosecutor, Jason Wharton, was in effect at the time of the events that led to this federal indictment.  Additionally in the state plea agreement, Mr. Wharton agreed not to "refer the acts giving rise to the [state] offenses to the United States Attorney's Office for Federal prosecution."  (Docket 32, p. 5.)  Thus, Defendant

argues that his federal prosecution was inappropriate.  In the pending motion to suppress, Defendant maintains that statements made by him to the police on March 8, 2008, should be suppressed as the result of an illegal search and seizure.

On March 8, 2008, Defendant was a passenger in a vehicle that was stopped by police near the Wal-Mart in Parkersburg, West Virginia.  At the hearing, West Virginia State Trooper Kocher testified that he stopped the vehicle because he knew the driver did not have a driver's license.[1] Trooper Kocher verified that the driver's license was suspended and arrested the driver for driving on a revoked license.  Then, Trooper Kocher searched the driver and found unlabeled pills, loose in his pocket, that the driver claimed were "Tylenol."  Upon finding the pills, Trooper Kocher contacted a Parkersburg Narcotics Task Force (PNTF) agent, Captain R.L. Woodyard.

Subsequently, Trooper Kocher approached Defendant and asked if he had anything illegal on him, to which Defendant responded that he did not and gave Trooper Kocher permission to search him.  Trooper Kocher then found approximately $1600.00 in cash on Defendant.  Shortly thereafter, Captain Woodyard arrived and talked to Defendant about a recent purchase of illegal drugs from Defendant.[2]  Defendant agreed to offer assistance to the police and to further discuss the matter at the Wood County Sheriff's office; he was never placed under arrest.

Captain Woodyard testified that when Defendant was at the station on March 8, 2008, he was read his *Miranda* rights and given a written rights waiver form, which Defendant signed.  This document, with a signature from Defendant, was introduced as an exhibit at the hearing.  At the

---

[1]  Trooper Kocher himself had previously cited the driver for this offense.

[2]  Captain Woodyard testified that he told Defendant that the police had evidence that Defendant had sold illegal narcotics to an undisclosed person the day before.

station, Defendant indicated to the officers that he had illegal drugs at his residence.  Billy Raye Limley, Defendant's fiancé, testified that she spoke to Defendant while he was at the station.  Ms. Limley stated that Defendant told her that he was going to prison for a long time and that he needed a attorney.  Later that day, PNTF agents seized 61.13 grams of cocaine base from Defendant's residence.

Stemming from the March 2008 incident, Mr. Wharton mailed a letter to Defendant's counsel at the time, Dean Furner, which described a plea agreement the parties had made. Defendant agreed to "make two buys from two individuals" and not to violate any other laws.  Mr. Wharton agreed not to forward the information that related to Defendant's state plea agreement to the federal government.  (Docket 32, p. 5.)  Pursuant to this agreement, Defendant participated as a confidential informant in at least one drug transaction.

On July 22, 2009, Defendant was charged with obstructing an officer; he entered a guilty plea for this charge on September 16, 2009.  Then, on July 30, 2009, PNTF agents made controlled purchases of cocaine base from the Defendant.[3]  Officer Douglas Sturm, a PNTF agent, witnessed this delivery.  This information was relayed to Mr. Wharton,[4] and is what purportedly led him to believe that Defendant had breached the plea agreement.  Defendant was then indicted by a federal grand jury on April 20, 2010 for the cocaine base found in his residence on March 8, 2008.

---

[3]  Evidence was also presented that officers made two controlled buys from Defendant in December 2009.

[4]  A letter dated August 5, 2009 from Mr. Wharton to Officer Sturm provides in pertinent part: "This letter serves to confirm our conversation that the plea offer to William Barber is revoked in light of the recent purchase of cocaine."  (Docket 35-1.)

## II. DISCUSSION

### A. Motion to Dismiss

Defendant makes several arguments regarding the plea agreement in an effort to persuade this Court to dismiss the indictment. One argument concerns Mr. Wharton's ability to forward information to the United States Attorney's Office so that Defendant could be prosecuted federally. Defendant asserts that the officers investigating Defendant "worked with both the federal government and the state government." (Docket 32, p. 1.) These investigations led to both Defendant's federal and state charges. In the plea agreement, Mr. Wharton agreed not to refer the matter for federal prosecution. However, after Defendant's breach of the plea agreement, federal prosecutors were made aware of the information that led to this federal prosecution. Defendant believes that this was inappropriate because of the plea agreement. Whether this was a violation of the plea agreement is of no concern. In the absence of a federal prosecutor authorizing or appearing to authorize the state prosecutor to settle a defendant's federal criminal liabilities with a plea to a state charge, the federal prosecutors are not bound by the state prosecutor's representation. *United States v. McIntosh*, 612 F.2d 835, 837 (4th Cir. 1979) (citing *United States v. Long*, 511 F.2d 878 (7th Cir. 1975)) ("A bare representation by an unauthorized party cannot bind federal prosecutors to forego prosecution."). The federal government was not a party to Defendant's state plea agreement and there is no indication that the United States was aware that this representation had been made. Thus, the United States Attorney's Office cannot be bound to this agreement, regardless of its validity.

Next, Defendant argues that this Court has the authority to enforce the plea agreement he made with the state prosecutor and rule upon its validity. While there is some authority that federal

4

district courts can review the constitutionality of state plea agreements, *see e.g., United States v. Morris*, 470 F.3d 596 (6th Cir. 2006), it is ordinarily "inappropriate" for a federal court to review a challenge to a state court plea agreement without allowing the state court the opportunity to review the agreement.  *United States v. Ayala*, 601 F.3d 256, 269 (4th Cir. 2010) (citing *United States v. Bouthot*, 878 F.2d 1506, 1511 (1st Cir. 1989)).  In this matter, a state judge never accepted the agreement or had any chance to rule upon the validity of the agreement.  It would be especially inappropriate for this Court to review an agreement where Defendant did not even enter a plea in state court and the state court did not have an opportunity to review the plea agreement.  Further, the state is not a party in this case.

Defendant also argues that the state prosecutor unilaterally revoked the plea agreement and referred the matter to the United States Attorney's Office for federal prosecution, in violation of one of the provisions of the plea agreement.  Defendant states that Mr. Wharton was bound to abide by the plea agreement when Defendant acted to his "substantial detriment" by acting as a confidential informant for the officers.  (Docket 56, p. 4 (citing *State ex-rel Grey vs. McClure*, 242 S.E.2d 704 (W. Va. 1978)).)  While Defendant may have acted to his detriment by participating in a controlled buy, Mr. Wharton did not revoke the plea agreement until it was already breached by Defendant as a result of the unsanctioned buys he participated in.  Defendant was on notice that a violation of any other law would be a breach of the plea agreement.[5]  However, the plea agreement is not explicit about the consequences of such a breach.  Even though it is reasonably clear that Defendant

_____

[5] Paragraph 11 of the plea agreement states: "The Defendant further understands that should he violate any law of this State, any other State, the United States, or any municipality between today and the entry of his plea of guilty, the State shall not be obligated to proceed with said plea." (Docket 32, p. 5.)

5

breached the plea agreement, it is unclear whether Mr. Wharton's revocation was improper. Nevertheless, the Court does not need to delve into interpreting the agreement because the crux of this federal prosecution concerns whether the United States Attorney's Office was able to prosecute Defendant for his alleged drug dealing. As detailed above, the Government was not a party to Defendant's state plea agreement, and cannot be required to act in accordance with whatever rights and duties are derived from the agreement.

Additionally, Defendant argues that the plea agreement should be enforced because the Government did not provide any evidence at the hearing that the Defendant breached the plea agreement: "At most, an officer testified to uncorroborated hearsay evidence of a general nature that Defendant was engaged in drug activity but presented no first hand knowledge, no specifics and nothing that could be cross-examined." (Docket 56, p. 3.) However, this is precisely the opposite of the evidence presented at the September 1 hearing. Officer Sturm testified that he was the surveillance agent in July 2009 when Defendant made an unauthorized delivery of a controlled substance that was not a part of the plea agreement. However, as stated above, the Court is not concerned about the effect of a breach. What is most important is that the federal government acted properly in bringing these charges against Defendant.

### B. Motion to Suppress

The Fourth Amendment protects citizens from "unreasonable searches and seizures." U.S. Const. amend IV. Many situations qualify as a search or seizure, but for the instant matter, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief and limited purpose, constitutes a seizure of a person within the meaning of the Fourth Amendment." *United States v. Brugal*, 209 F.3d 353, 356 (4th Cir. 2000) (quoting *Delaware v.*

*Prouse*, 440 U.S. 648, 653 (1979)).  Warrantless searches are usually unreasonable under the Fourth Amendment, unless an "established and well-delineated exception" to the warrant requirement exists.  *Arizona v. Gant*, 129 S. Ct. 1710, 1716 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  One of those exceptions is a search incident to a lawful arrest.  *Gant*, 129 S. Ct. at 1716 (citing *Weeks v. United States*, 232 U.S. 383, 392 (1914)).

Defendant argues that the March 28, 2008 stop was improper because "there was no probable cause that [Defendant] had committed any crime whatsoever, nor did the investigating officers have grounds to detain and/or question [Defendant]."  (Docket 33, p. 1).  First, the stop was warranted because Trooper Kocher knew that the driver did not have a valid license, and the accompanying search of the driver did not violate the Fourth Amendment as it was incident to a valid arrest.

Furthermore, because of Trooper Kocher's past involvement with the driver and Defendant concerning illegal drugs, the discovery of the pills would have provided sufficient reasonable suspicion for Defendant to also be searched and detained for a time.  *Florida v. Royer*, 460 U.S. 491 (1983); *United States v. Foreman*, 369 F.3d 776 (4th Cir. 2004).  However, Trooper Kocher testified that he did not have any suspicion that Defendant had anything illegal on him.  Nonetheless, at Defendant's suggestion, he was searched and found to have a large amount of cash, adding to the reasonable suspicion.  These events do not give rise to anything improper under the Fourth Amendment.  Defendant was the passenger of a car, the driver of which was legally arrested, and he consented to a search of his person.  No evidence will be suppressed as a result of the stop.

Second, the questioning of Defendant was appropriate because Defendant consented and volunteered to go to the station to talk with the police.  Therefore, no evidence will be suppressed

on the grounds that officers improperly questioned Defendant.  Defendant's consent removed any concern of impropriety in taking Defendant in to the station to talk with the police.

While Defendant originally argued that the statement he gave to officers on March 8, 2008 should be suppressed because it "flowed from and was the fruit of an illegal stop and detainment of [Defendant] occurring earlier that day," (Docket 33, p. 1), he did not advance that argument in the supplemental briefing.  In that brief, Defendant only argues that the evidence obtained from Defendant at the March 8, 2008 interview should be suppressed because Defendant was denied his request for an attorney.  (Docket 56, pp. 5-6.)  This argument is based on testimony from Defendant's fiancé, Billy Raye Limley.  Defendant contends that Ms. Limley's testimony shows that Defendant "asked for an attorney before making the decision to cooperate with the investigating officers."  Because Defendant was not provided an attorney, he argues that his constitutional rights were violated and that "any statements taken after he requested [an attorney] should be suppressed. (*Id.* at 6.)  The Government counters that because "[D]efendant was never taken into custody or arrested, his Sixth Amendment right to counsel was never at issue."  (Docket 57, p. 3.)  Further, the Government contends that the statements were given freely and voluntarily because Defendant was provided with Miranda warnings orally and in writing," which were confirmed during a recorded interview with the Defendant.  (*Id.*)  In addition, Defendant signed a from while at the station consenting to the search of his residence.[6]  When investigators did come to Defendant's house on March 28, 2008, they let him remain at his residence and did not arrest him.

---

[6]  A "consent to search" form was admitted as evidence at the September 1 hearing for Defendant's residence at 2306 Broad Street.

The *Miranda* waiver form and the testimony from Captain Woodyard show that Defendant was aware of his constitutional rights.  Ms. Limley's testimony does not show that Defendant requested to speak to an attorney before speaking to the officers.  His conversation with her was simply an offhand remark, not a request made to the police for an attorney.  The Court does not find that Defendant was denied a request for an attorney.  Defendant knowingly, intelligently, and voluntarily waived any constitutional rights he was due.  Thus, the statements from the March 8, 2008 questioning with police were proper, and any evidence obtained because of those statements will not be suppressed.

## III.  CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss Indictment [Docket 32] and Motion to Suppress [Docket 33] are **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        November 8, 2010

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE